## ESLAVA ET AL. *vs.* LEPRETRE.

1. The Orphans' Court has no jurisdiction to declare a person a lunatic, or *non compos mentis*, and to appoint a guardian for him as such, without the issue of a writ *de lunatico inquirendo*, and the finding of a jury thereon ; and if a guardian is appointed for a person, as being *non compos mentis*, without these preliminary proceedings, the appointment is void, and may be impeached in any court, in a collateral proceeding in which a party seeks a benefit under it.

2. A party is entitled to notice of proceedings against him in the Orphans' Court, to declare him *non compos mentis*, and to appoint a guardian for him ; and the appointment is void, if made without notice.

3. Where a bill is filed to foreclose two mortgages on land, one executed by the mortgagor and his wife jointly, and the other by the mortgagor and the wife's guardians, who were irregularly appointed by the Orphans' Court, without the issue of a writ *de lunatico inquirendo*, upon the mere petition of her husband, alleging that she was *non compos mentis ;* and the guardians are made parties to the bill, but the wife is not—it is error, to proceed to a final decree, until the wife is properly brought in ; nor can the complainant excuse his neglect in failing to proceed regularly against her, by setting up her want of interest in the mortgaged property ; nor is the error cured by the subsequent appointment of a guardian *ad litem* for her.

(Chilton, J. *dissenting*, held, that the wife was not a necessary party to the bill, as the court could not, by any decree rendered in the foreclosure suit, affect her right to dower in the mortgaged premises.)

4. It is erroneous to render a final decree against a non-resident defendant, who has not answered, or otherwise submitted to the jurisdiction of the court without the execution of the bond required by the statute, (Clay's Digest, 353, § 45,) although a decree *pro confesso* has been regularly entered against him on notice by publication.

5. All assignments of error should point to a particular part of the proceedings of the court below, in which the error complained of is thought to exist; an assignment is too general which alleges, that "the bill and amended bill were not sufficient to warrant the proceedings had on them;" so also, "that the proceedings were irregular, informal and insufficient, and not in accordance with the rules of Chancery Practice."

6. In a foreclosure suit, if the defendants, being adults, do not suggest to the court that the mortgaged premises greatly exceed in value the amount of the mortgage debt and are capable of sub-division, and move for a reference to the master to ascertain these facts, the Chancellor may well go on, and decree a sale of the whole of the mortgaged premises; and this, notwithstanding there are two mortgages, between the same parties, for the same debt, and differing only as to the premises conveyed.

7. But a different rule would prevail, if any of the defendants were infants, persons *non compotes mentis*, or under any other legal disability which would prevent them from appearing, and contesting the matter with the complainant.

8. It is discretionary with the Chancellor to allow time for the payment of the sum reported by the master to be due on the mortgage debt; he may decree a foreclosure and sale absolutely, without giving day to the mortgagor, and such decree will be free from error.

9. It is irregular to take any order in a chancery proceeding, generally affecting the merits of the case, until it is at issue as to all the parties; if the person not before the court is regularly made a party, by proper allegations and prayer for subpœna, the irregularity cannot be excused by the supposition that he is not a necessary party.

10. A wife is not entitled, as against the mortgagee, to dower in lands which are conveyed to her husband, and by him on the same day mortgaged to his vendor, to secure the payment of the purchase money.

11. The wife's right to dower in lands aliened by her husband during coverture, can only be relinquished by herself in person.

12. An agreement between mortgagor and mortgagee, made contemporaneously with the loan, that the interest shall be converted into principal as it becomes due, is oppressive, unjust and tending to usury, and cannot be supported in equity; but after interest has accrued, it then becomes a debt, and may, by subsequent agreement, be considered a part of the principal, and thenceforth bear' interest, provided, there is no extortion on the part of the mortgagee.

13. If the interest runs in arrear, and rests are made from time to time in the mortgagee's account of arrears, on which interest is calculated, and finally a general account of all arrears is had, calculated on the footing of the previous rests, which is signed by the mortgagor, and secured by a second deed of mortgage, although executed after the lapse of several years, the transactions are

33

Eslava et al. v. Lepretre.

not usurious; and equity will charge the mortgaged premises with the payment of the sum so found due, where there is no conflicting lien, or subsequent incumbrance on the property, at the time of this settlement.

14. Where the mortgage debt is created in this State, and the mortgagor, being unable to pay it, afterwards agrees to pay ten per cent. interest, as an indemnity to the mortgagee for interest paid by him on money borrowed in Louisiana, at a higher rate of interest than is allowed by the laws of this State, the agreement is oppressive and unjust, and will not be upheld in a court of chancery.

15. If a mistake is made upon a general accounting between mortgagor and mortgagee of all arrears of principal and interest, in consequence of which the new note and mortgage are taken for less than the amount actually due according to the basis on which their calculations are made, the sum thus omitted through mistake cannot be considered a part of the mortgage debt, as against a subsequent mortgagee, or a purchaser of the equity of redemption, whose rights intervene before the mistake is discovered and corrected.

ERROR to the Chancery Court of Mobile.
Heard before the Hon. J. W. LESESNE.

John B. Lepretre exhibited his original bill against Miguel D. Eslava, and Adrian S. Dumie and Ovid Mazange, guardians of Louise Eslava, wife of said Miguel, setting forth, that on the 10th day of September, 1835, M. D. Eslava and Louise his wife, being indebted to him in the sum of $67,-776$\frac{15}{100}$, payable at various times, and in various amounts, as set forth in said bill, made to him a mortgage of an interest of three-fourths in a certain lot in the city of Mobile, as security for the payment of said debt; that the sum thus due, and secured, was for the purchase money of said lot, which was conveyed to Eslava by complainant and wife, by deed bearing even date with the mortgage; that all the notes given by Eslava for the purchase money, and secured by the mortgage, have been fully paid, except the last, which is for the sum of $18,414, which was due on the 7th day of September, 1839; that subsequent to the delivery of the mortgage aforesaid, Louise Eslava became *non compos mentis*, and Adrian S. Dumie and Ovid Mazange were, by the Orphans' Court of Mobile, duly appointed her guardians.

The bill further charges, that on the 30th of January, 1845, M. D. Eslava, being indebted to complainant in the sum of $23,402$\frac{29}{100}$, made to him another mortgage to secure the payment of that sum, in which said Eslava was joined by Adrian

S. Dumie and Ovid Mazange, as guardians of Mrs. Eslava. By this last mortgage the remaining one-fourth interest in the lot conveyed by the first mortgage was conveyed to complainant, with another lot in the city of Mobile, described as lying at the north west corner of Government and Royal streets, fronting on Royal street, and south of the lot formerly conveyed by the first mortgage mentioned in the bill; that the latter mortgage was intended as an additional security; that, at the date of the last mortgage, there remained due, of the money secured by the first, the sum of $23,402\frac{2.9}{100}$; that this sum is wholly unpaid. The bill prays that Eslava, "and Adrian S. Dumie and Ovid Mazange, guardians of Louise Eslava, wife of M. D. Eslava, may be made defendants;" that subpœna issue to them; that the equity of redemption be foreclosed, and the lots sold to satisfy the mortgage debt of complainant.

The mortgages are made exhibits to the bill, and are fully set out in the record. The execution of the first mortgage was acknowledged by Eslava and wife before a notary public, and duly certified for registration. The execution of the second mortgage is also acknowledged by M. D. Eslava, and Adrian S. Dumie and Ovid Mazange, as guardians of Louise Eslava.

Subpœna issued, and was returned by the sheriff executed on Eslava, Dumie and Mazange, to the two latter of whom it was directed as guardians of Louise Eslava.

Miguel D. Eslava answers, denying that his wife Louise was indebted to the complainant in any sum whatever; admits that he (respondent) was indebted to complainant in September, 1835, in a large sum of money, which was secured by divers notes of respondent, and sundry other persons, transferred to complainant; and that said complainant then held two notes on respondent, one for $16,791\frac{62}{100}$, and the other for $18,414, as set forth in the bill; he admits making the mortgage to secure the sums mentioned in it, on the property described by it; but denies that the mortgage is correctly described in the bill, so far as it relates to the note for $18,414, and denies making the condition concerning that note, as it is charged in the bill. He admits that all the notes set out in the mortgage have been paid, except the one for

$18,414, which, with its interest, has not been fully paid; that the mortgage was made when property was high, and money abundant and easily obtained; that soon afterwards a general bankruptcy ensued, and he was unable to meet punctually his several liabilities to complainant; that he was compelled to apply for an extension of time on a part of the mortgage debt; that an extension was granted by complainant, but he required additional security, and demanded usurious interest; that complainant has, in his accounting with respondent about his debt, since that time, compounded interest at 8 per cent., and charged 2 per cent. over and above the legal rate for his forbearance and giving day of payment, and has even compounded the interest at 10 per cent., and pretends that he holds an agreement made by respondent which justifies it, made simultaneously with the second mortgage. He admits that the original mortgage is signed by Mrs. Eslava, but denies that it has any validity as to her. He admits making the second mortgage on the 30th January, 1845, but says it was made to procure an extension of the time for the payment of the debt. He admits that, in the recitals of this mortgage, the debt is set down at $23,402\frac{20}{100}$; but denies that so much was really due complainant, and says it was made up partly by compounding the interest, and partly of usury charged for giving day of payment. He alleges, that he has paid, on the notes due from him to complainant, large sums of money, and has otherwise with property, and in accepting drafts drawn by complainant, paid him $35,679\frac{52}{100}$ towards the notes for $16,700\frac{62}{100}$ and $18,414; that, as agent for complainant, he has paid out of his own funds $2,946\frac{30}{100}$, for filling up a lot belonging to complainant, and he insists that this sum should be allowed him as a credit; that he has paid the principal and part of the interest on the debts intended to be secured by the mortgage, and only a small sum remain due; that, all just credits being allowed, this sum amounted in April, 1849, to $6,540, and no more.

In further answering he says, that the lands mentioned in the deed of mortgage greatly exceed in value the amount due complainant, and in 1845 respondent, being indebted to Don Gregorio Funes y Munos in about the sum of $29,000, made to him a mortgage on said premises to secure the pay-

ment of said sum of money; that on the 30th January, 1845, respondent made a lease to one Chantron for part of the premises for six years, with the assent of complainant; that since the making of said mortgage and lease, he has sold to Ovid Mazange his entire interest in said premises, and that he now claims no interest whatever, having conveyed his equity of redemption to said Mazange. He insists that the last deed of mortgage is not binding on his wife Louise Eslava, as she never executed it, and Dumie and Mazange, who executed it as her guardians, had no authority to bind her. He insists that Dumie and Mazange are not fit persons to represent the interests of Louise Eslava (who is yet a lunatic) in this suit, as their interests conflict with hers, the former being the agent of complainant in conducting this case, and the latter, the present owner of the equity of redemption in the premises.

The subpœna having been returned executed on Dumie and Mazange as guardians of Louise Eslava, and they having failed to answer, a decree *pro confesso* was entered against them at the April term, 1849, and the cause was continued, with leave to complainant to amend his bill.

The amended bill charges, that the debt secured by the two mortgages named in the original bill was the individual liability of Miguel D. Eslava, and not the debt of Louise Eslava; that the date of the note for $18,414 is incorrectly stated in the original bill; its true date is 7th September, 1835; that the original debt secured was due to complainant from M. D. Eslava for the purchase money of the lot named in the first mortgage, and on no other consideration; that the deed made by complainant to Eslava for the premises, and the mortgage from Eslava and wife to complainant, were contemporaneously executed. He insists that his lien is superior to any right of Mrs. Eslava in the premises; that subsequently to the making of the second mortgage, complainant and Eslava entered into an agreement, which is exhibited with the bill, by which Eslava was to assign to complainant the leases taken from tenants who occupied the premises; and the rents reserved in said leases, after paying certain claims and expenses in said agreement mentioned, were, for four years, to be applied to the payment of

the mortgage debt, and during this time complainant was not to resort to his legal or equitable remedies on his mortgage; that annual rests were to be made in the accounts between the parties, balancing the interest account, and converting interest into principal once a year, and not oftener; that this agreement was not to impair the mortgages as securities; that, needing money in Louisiana, complainant very reluctantly agreed to extend the time; that complainant requested Eslava to act as his agent in receiving the rents, and in the management of the property, and for this purpose handed him the leases which had been assigned to the complainant; that Eslava undertook such agency, and agreed to account to complainant in the capacity of agent; that Eslava took the rents and profits to his own use, and has refused to account as agent; that, for more than a year after the term of four years had expired, and for some time previous to the filing of the original bill in this case, Eslava assumed a hostile attitude towards complainant, and wholly refused to account as agent, or under the agreement aforesaid; that up to November, 1847, Eslava made various remittances and payments to complainant, for which he has received credit, but there still remains about $20,000 of the mortgage debt unpaid; that, in consequence of the indulgence extended to Eslava, complainant was compelled to borrow money in Louisiana, the State of his residence, at 9 per cent. per annum, payable in advance, with an annual renewal of the note; that the bank from which he borrowed is allowed by its charter to charge interest at that rate; that, in view of this, Eslava, on the same day on which the other agreement was made, but after it had been signed, voluntarily agreed to pay complainant 2 per cent. additional interest, on all sums he might thus be compelled to borrow.

The bill further charges, that complainant is informed and believes that Ovid Mazange, Don Gregorio Funes y Munos, William F. Bartly, Chapman Coleman, Pepin Chantron, and James S. Deas claim some interest in the premises, or in some portion of them, and prays that they be also made parties. It also prays that a receiver be appointed.

On the bill as amended subpœna issued, and an order of publication was made and executed as to Don Gregorio Funes

y Munos, as to whom a decree *pro confesso* was taken. A decree *pro confesso* was also taken, on service of subpœna, against Ovid Mazange in his own right, and as guardian of Louise Eslava, on the 7th January, 1849. The subpœna was returned "not found" as to Jas. S. Deas.

No other order appears to have been taken in the case until the January term, 1850, when the court appointed Wright C. Stanley guardian *ad litem* for Louise Eslava, and ordered him to answer within thirty days. At the same time an order was made dismissing the bill as to A. S. Dumie and Ovid Mazange, guardians of Louise Eslava, upon the ground that they were improper persons to .represent her interest, by reason of their interest in the subject matter of the suit. This dismissal was by consent.

To the amended bill Miguel D. Eslava filed his answer, in which he admits entering into the agreement as set forth in the complainant's amended bill. He admits, that he was to rent the premises, and remit an amount equal to the rents annually to complainant, for the term of four years mentioned in said written agreement; that he did account to complainant annually for such sums, and pay them to him, or on his account to others; that "he used great caution in renting and leasing the premises, but notwithstanding this, loss was sustained by the failure and inability of some of the tenants to pay their rents." He denies that complainant was ever put in possession of the mortgaged premises, or that such was ever the purpose of the agreement.

He insists that the second agreement mentioned in the bill, dated 5th February, 1845, allowing complainant to demand 10 per cent. on the mortgage debt, or such portion of it as is mentioned in it, was part and parcel of the contract for forbearance for four years, and was drawn as it is by advice of counsel, and was a shift or device to avoid the usury laws of Alabama; that the interest thus reserved is usurious; that even before this agreement was entered into, the complainant had charged usurious interest in his annual accounts respecting the mortgage debt, and by this means the amount had been swelled to the sum of $23,402\frac{2\,9}{1\,0\,0}$ at the time the last mortgage, and the agreements mentioned in the amended bill, were executed; that these agreements were entered into by

him, not willingly, but to prevent a foreclosure and sale under the first mortgage, at a time when he was unable to pay the mortgage debt, and the property was likely to be sacrificed; under this constraint he agreed to pay 10 per cent. per annum for forbearance for four years. He knows nothing of complainant's being compelled to pay 9 per cent. for the loan of money in Louisiana, and never agreed for any such consideration to pay him 10 per cent. in Alabama. He denies that the sum stated in the note dated 4th February, 1845, is really due, or was due at that time, upon an honest and legal accounting between complainant and himself. He denies that he ever abused any trust reposed in him by complainant·

Mazange answers, stating that, in 1849, he purchased of Eslava the fee simple of the lands named in the mortgages, and received from him a deed for the same, which was duly recorded, and is exhibited with his answer; that of his own knowledge he is not informed of the matters complained of in the original and amended bills of complainant. He admits that the lands mentioned in complainant's mortgages are a part of the lands afterwards sold and conveyed by Eslava to this respondent, and he is informed and believes that Eslava is considerably indebted to complainant; that he is willing and ready to pay to complainant whatever amount may be really due on his mortgages; that the mortgage premises are worth much more than the sum so due. Stanly, as special guardian of Mrs. Eslava, answers, denying the allegations of the bill and amended bill, and calling for proof. A decree *pro confesso* is rendered against Don Gregorio Funes y Munos.

Bartly and Coleman answer jointly, admitting the mortgages set forth in the bill and amended bill, and that a considerable sum is due on them; are ignorant of the other matters set forth in the bill; that they are interested under a subsequent mortgage made on the premises by M. D. Eslava to Don Gregorio Funes y Munos, including the premises, which they are ready to produce, and they claim whatever balance may remain on a sale of the lots, after satisfying complainant's demand.

Chantron answers, that he knows nothing except from information, of the several matters contained in the bill; that

he leased from M. D. Eslava a part of the mortgage premises for the term of six years, and was put in possession by him; that he erected a building thereon of the value of $6,000; that he afterwards conveyed the lease-hold premises, with the consent of M. D. Eslava, to Adrien S. Dumie in trust to pay certain debts named in the deed of conveyance which is duly recorded; that his lease-hold interest was sold by Dumie under the deed, and Thomas A. Hamilton became the purchaser, but no conveyance was made to him; that James S. Deas obtained a decree against respondent on a builder's lien, and his term in the lease was decreed to be sold to satisfy said lien, but no sale has ever taken place; that said Deas took possession of the lease-hold premises, and shortly afterwards the building was totally destroyed by fire; that since the burning Deas has released all his right to one Reid.

On the 2d April, 1850, the decree *pro confesso* against Chantron was set aside.

At this stage of the proceedings the Chancellor, at the April term, 1850, made an interlocutory decree, referring the accounts between the parties to the master, ordering him to report thereon under the following directions:

1. That he report the amount due on the mortgages, at simple interest, without reference to the settlement made between Lepretre and Eslava referred to in the articles of 4th February, 1845;

2. That he report the amount due on said mortgages, noting the sum received by the parties in their articles of agreement of the 4th February, 1845, to ascertain the amount due at the time named in said articles of agreement, with simple interest calculated thereon;

3. That he state the account, and ascertain what is due, upon the principles agreed on by Lepretre and Eslava in their articles of agreement of the 4th February, 1845, and the contract of Eslava to pay two per cent in addition to lawful interest on his debt due to Lepretre;

4. That he report the amount, if any, which Eslava is entitled to claim of Lepretre for filling up the lot in the pleadings named, and also all sums of money that Eslava should be charged with for rent and enjoyment of said lot;

5. That the parties have leave to take further testimony, and examine witnesses before the master;

6. All questions arising on the testimony and pleadings are reserved until the hearing, and leave is given to apply for further directions.

The master proceeded to state an account under this decree, which was signed on the 30th January, 1851. To this report Eslava and Mazange filed exceptions. At the April term, 1851, the Chancellor pronounced his final decree, and set aside the master's report, because, as he says, "it is admitted on both sides that the master's calculations are not accurate; there must be another reference, and the exceptions therefore to the report he has made need not be noticed."

He then makes another order of reference, accompanied with further directions to the master. These are, that the sum of $23,502\frac{29}{100}$ due on the 7th day of February, 1845, be taken as the basis of the account, and that interest, at the rate of eight per cent. annum, be allowed on said sum until the first payment, when that payment will be deducted, first paying interest, and then principal, and so on until all the payments are allowed, and that he report the balance due on the mortgage after such accounting.

In the report which he made under the first order of reference, the master allowed to Eslava a credit of $2011 34 for filling up a lot, belonging to complainant, the work having been done by one Dealy, under a contract with Eslava. In the accounting under the last order, this item was excluded altogether, and the master refused te hear proof concerning it. On this last accounting the master reported a balance due the complainant amounting to $19,752 87.

This report was made on the 17th April, 1851, and confirmed on the 19th of the same month. No exceptions are reported by the master as having been taken before him. It appears, however, in the recitals of the decree of foreclosure, that, after the report was made, and on the day of its confirmation by the Chancellor, the defendants moved the court to allow them further time to file exceptions, which was refused by the court, and the report, as it came from the mas-

Eslava et al. v. Lepretre.

ter, was confirmed. The Chancellor then proceeds to establish the debt of complainant for the sum so reported, as a prior lien on the mortgage premises, and continues, "and that said defendants, on or before the 30th day of April instant, do pay to said plaintiff the sum of $———, so reported by the master to be due on said mortgage, with the interest and the cost to be taxed in said cause. And in default of the payment as aforesaid, the master is directed, reserving the right of dower of the defendant Louise L. Eslava, wife of said Miguel D. Eslava, in and to the premises described in the second deed of mortgage executed to the plaintiff, and dated on the 31st day of January, 1845, as to which last mentioned premises the right of dower of the said ·Louise L. Eslava is reserved to her, and reserving all rights that may be outstanding against the said plaintiff, under and by reason of the indenture of lease between the said Miguel D. Eslava and Pepin Chantron, in the pleadings described, to proceed and sell the lands described in the two deeds of mortgage, in the pleadings mentioned, at public auction, in front of the courthouse of Mobile county, and between the usual hours of sheriff's sales, first giving due and legal notice of the time and place of said sale, by advertisement once a week for thirty days previous thereto, in some newspaper printed and published in the city of Mobile, and posting notice on the courthouse door of said county. In all respects, the master, in conducting said sale, will be governed by the same rules and regulations as govern sheriffs in the sale of like property under execution. And from the proceeds of said sale the register will first pay and satisfy the complainant's debt, with interest, and the costs of suit, and any balance remaining in his hands he will bring into court, to abide its further order and decree, and what he shall have done in the premises, he will report at the next term of this court."

From this decree a writ of error is sued out by the defendants in the court below, and they here assign for error:

1. That proper parties were not made to ̖the bill, before the decree was rendered;

2. That there was error in all the proceedings in reference to Mrs. Louise L. Eslava, as she was never properly brought before the court;

3. The court erred in appointing a guardian *ad litem* for Mrs. Eslava, and said appointment was irregularly and improperly made;

4. The decree absolute against Don Gregorio Funes y Munos is erroneous;

5. The court erred in decreeing against Bartly and Coleman;

6. The decree and order of reference of the 15th of April, 1850, is irregular and erroneous;

7. The court erred in the decree and order of reference made at the December term, 1850;

8. The court erred in making the final order of sale on the 19th of April, 1851;

9. The court erred in ordering a sale of the whole mortgaged premises, when they were capable of being sold in parcels, under the separate mortgages, and a part only was sufficient to pay the mortgage debt;

10. The court erred ' in making the decrees of reference at different times, and in making the second when the first was undisposed of;

11. The court erred in proceeding under the second order of reference without deciding the questions arising on the exceptions to the master's report under the first, and in treating the first order of reference as a nullity without having regularly reformed or set it aside;

12. The court erred in its opinon and decree as to the proper method of computing the interest;

13. The court erred in decreeing the premises under the second mortgage to be sold to satisfy a debt of $23,502 29, when the debt secured by it was only $23,402 29, and it was error to charge the premises with the payment of a greater sum;

14. The court erred in rendering a final decree on the coming in of the master's second report before two entire days had elapsed, and in refusing to extend the rule for excepting to said report until the expiration of said two days;

15. The final decree of the Chancellor is imperfect and erroneous in this, that it does not specify the sum for redeeming the property mortgaged;

16. The court erred in directing a sale so soon after the decree;

Eslava et al. v. Lepretre.

17. The court erred in decreeing a sale and payment to the complainant, without requiring the bond required by the statute;

18. The court erred in confirming the master's report, and founding its decree thereon, which made no allowance to Eslava for filling up the lot of Lepretre, when such allowance had been made in a former report, which had never been vacated or set aside on exceptions regularly taken;

19. The court erred in not charging complainant with the rents and profits while he was tenant in possession of the mortgaged premises;

20. The court erred in decreeing for the the complainant, notwithstanding the objections of the defendant to the master's report;

21. The court erred in decreeing against the defendant Chantron as shown in the record;

22. The court erred in rendering the several decrees *pro confesso*;

23. The court erred in confirming the master's report, when the same was improper and erroneous on its face;

24. The court erred in decreeing against Jas. S. Deas as shown in the record;

25. The court erred in ordering the defendants to pay all costs by its order of the 21st January, 1850, as shown by the record;

26. The court erred in rendering the final decree, as the same is not authorized by the pleadings and proof;

27. The court decreed for more than was lawfully due;

28. The bill and amended bill were not sufficient to warrant the proceedings had on them;

29. The proceedings were irregular, informal and insufficient, and not in accordance with the rules of Chancery Practice.

The complainant below assigned cross errors, and in his assignment objected to the decree, because the Chancellor decreed to complainant a less amount than the proof showed to be due.

Geo. N. Stewart, for plaintiffs in error.

P. HAMILTON, *contra :*

1. The record shows that all necessary parties were brought regularly before the court by personal service or publication, and all parties that are affected by the decree have answered. Munos is not a necessary party, and his interest has been transferred to Bartley & Coleman, who have answered. But the publication and decree *pro confesso* are regular. 16 Ala. 233; 17 Ala. 738.

2. In this case it was not necessary to serve process personally on Mrs. Eslava. No separate estate was involved. 8 Ala. 605. Being a lunatic, with guardians, service upon the guardians or committee was all that was necessary. 2 Dana, 455; 2 Johns. Ch. 242.

3. Eslava having suggested to the court, that the guardians were improper persons to act, the Chancellor acted correctly in appointing a guardian *ad litem.* 1 Danl. Ch. Pr. 203; 1 Smith's Ch. Pr. 262; 2 Dana 455. As to property described in the first mortgage, she had no right to dower as against complainant. 4 Kent 38, 39; 4 Mass. 566; 15 Johns. 458; 15 Peters 21. As to property conveyed by second mortgage, her rights are reserved by the decree.

4 & 5. Munos and Bartley & Coleman were properly made parties defendant, though they were not necessary parties. 5 Ala. 167; 6 Ala. 452; 14 Ala. 38. They filed no cross bill, and if not properly in court, no harm is done; they are not precluded by the decree.

6. The reference of 15th April, 1850, was made when the case was ready for a decree, and evidently made to speed the cause, and to assist the Chancellor in arriving at the proper mode of stating the account. It was made by consent. Even if prematurely made, it is not error. 15 Ala. 61.

7, 10 & 11. The second order of reference was made after argument, and upon admitted error in the first report, which was before the court for a decree. This second order of itself overrules the first, and in terms purports to do so, and for reasons stated in defendants' exceptions. In analogy to practice in cases of reversal, this new order of reference is correct. 16 Ala. 616.

14 & 20. Two entire days elapsed between report and con-

firmation; it is so stated in the decree. The report is dated 15th April, endorsed read 17th, confirmed 19th April, 1851. It is plain from the order of confirmation, that exceptions had not then been made; for a motion to enlarge time in order to file exceptions was overruled by the Court. To grant or refuse such a motion was necessarily in the discretion of the Chancellor.

15. The decree is not imperfect as to the amount to be paid; it recites the report showing $19,752 $\frac{37}{100}$, to be due 15th April, 1851; though, probably to save labor, the report is not copied a second time, it appearing in the two preceding pages to which reference is made. Though a blank does appear in that part of the decree which orders payment to be made before sale, no mistake could exist as to the amount. 4 Ala. 187.

16. The time for payment is long enough; long day is not favored. 8 Porter, 277.

21 & 24. Deas and Chantron claim under a lease; they were not necessary parties, nor were any of the lessees. Story's Eq. Pl., § 151. Besides, all rights under lease are reserved by the decree. 15 Ala. 98.

25. The order as to the payment of costs and continuance of the cause was within the discretion of the court. Clay's Dig. 350, § 26; 15 Ala. 779; 7 Ala. 927; 5 ib. 551; 7 Port. 244.

19. Complainant agreed to go into possession and apply rents to the debt; he placed Eslava in possession as his agent, and credits the debt with every cent received; and there is no dispute about items of payment. Most of these payments were derived from rents collected by Eslava. Complainant agreed to wait four years without suit; Eslava, however, faithlessly repudiated the agreement. There is not an honest pretence in which this assignment of error can rest.

13. The facts are, the second mortgage calls for $23,402 $\frac{29}{100}$, as due 7th February, 1845. An error was made by the parties in the addition of certain credits; as shown in the testimony, the figures $1266 $\frac{43}{100}$, should be $1166 $\frac{43}{100}$. The proper credit added to other items, and all then subtracted, from the debt $27,958 $\frac{27}{100}$, makes the true amount $23,502 $\frac{29}{100}$. The account shows the error, and the letter of Eslava, of 15th April, 1845, admits it. The error was admitted to exist at

the time of making the first report. In this way it came about, that the sum of $23,502 $\frac{29}{100}$ was taken as the basis of the Chancellor's decree. If this be deemed an error on which to reverse, the defendant in error now offers to credit the debt, with that amount and interest.

18. As to the credit claimed by defendants for filling lot of complainant, that is an independent demand. That item was referred to the master by consent, at first report, when all the questions in bill and answers were referred. If this item can be at all looked to, it must be under articles of agreement, 4th April, 1845. But the defendant succeeded in excluding that agreement from entering into the account, and certainly should not be permitted to take advantage from it now; besides, the exception was not presented to the court, as it should have been.

9. As to order of sale of the whole property, there are no infant defendants. Mrs. Eslava's rights are fully protected by the decree of the court. The other defendants are adult and sane, and are not entitled to make the objection. 2 Ala. 415; ib. 149.

17. This point seems fully covered by the decisions. Bartley & Coleman submitted by answer. 9 Ala. 179. They were holders of the mortgage to Munos. Munos was not an indispensable party; the decree would be perfect without him. 14 Ala. 48; 6 Ala. 452.

22. The decrees *pro confesso* are regular, as to Munos, the only non-resident. 16 Ala. 233; 17 Ala. 738. The decrees recite that service was effected. The return as to Deas is not found in the record—but he only had a claim under the lease to Chantron, and was not a necessary party.

23. If there be any errors in the report of the master, they only go to errors in calculation of interest, and can be amended in this court. The complainant submits to any and all corrections of errors in the calculation of interest by the master.

The remaining assignments present the principles of the decree granted by the Chancellor for revision by this court. At or about the time of the execution of the second mortgage, Eslava and complainant came to a settlement, with regard to their debt. At that time, (January, 1845,) no third party's

interests were affected. Upon their settlement, there was
agreed to be due complainant on 7th February, 1845, the
sum of $23,402 29. It is contended that, in whatever way
that amount was arrived at, there is no pretence of usury,
even if interest past due had been compounded. Eslava and
those claiming under him are estopped by that settlement and
deed. The settlement became an account stated. Mitf. Eq.
Pl., 259 ; Adam's Eq., 226, Law Library.

An agreement to pay interest on interest past due, on set-
tlement of an account, has been uniformly supported. 2
Young & Col., 92 ; 23 Pick. R., 167 ; 6 Johns. Chan. R., 313 ;
5 B. & Ald. R., 34 ; 9 Vesey R., 224 ; 3 Wash. C. C., 350 ;
1 N. H., 169 ; 1 Johns. Chan., 13 ; 4 Yeates R., 224 ; Coote
on Mortg., 431, &c. ; 3 Powell Mortg., 909 a; 1 Wend., 521 ;
Cam. & Nor., 357 ; 4 Term R., 613. Here was an amount
arrived at upon the settlement, and fixed as the debt due. It
was in writing, and referred to and treated as part of the
mortgage debt, and answers all the requirements of the
strictest rules. Coote on Mortg., 431 *et seq.*, Law Library.

The defendant succeeded in repudiating the mode of keep-
ing the accounts provided by the articles of agreement of 4th
February, 1845, so far as it made against him ; surely it would
be inequitable to permit him to set that agreement up, where
it would benefit him, by allowing him interest on the pay-
ment made on the debt. Most of the payments made were
from rents, that Eslava agreed to receive and remit as agent
of complainant.

LIGON, J.—In settling the law arising upon the assign-
ments of error in this case, we will first consider those which
involve points of pleading and practice ; and then, those that
affect the merits of the controversy between the parties.

The three first assignments relate to the proceedings against
Mrs. Eslava, who is shown by the bill to have been *non com-
pos mentis* when it was filed, and under the guardianship of
Dumie and Mazange. The order appointing the guardians
was made by the judge of the County Court of Mobile, on
the      day of    , upon the petition of Miguel D. Eslava,
who represented that his wife was *non compos mentis ;* that
prudence and necessity required him to dispose of a portion

34

of his real estate; and that to cause it to bring a fair price in the market, it would be necessary to disencumber it of the dower of his wife; and as she was *non compos mentis*, and could not relinquish it, he prayed that guardians might be appointed with full power to do so. On this petition, a general order appointing Dumie and Mazange guardians was made by that court.

This appointment was made upon no other assurance of the fact of Mrs. Eslava's lunacy than the petition of her husband, without notice to her, and without the issue of a writ *de lunatico inquirendo*, and the verdict of a jury thereon. Without the issue of this writ, and the finding of a jury, the County Court judge had no power to declare her a lunatic, or to appoint a guardian for her. These proceedings are indispensable to give the County Court jurisdiction to make the appointment; and as they were not had, and that court is one of limited jurisdiction, the proceedings on the appointment of guardians are *coram non judice* and void. Such being the case, they may be impeached in any court, in a collateral proceeding, in which a party seeks a benefit under them. Weightman v. Karsner, 20 Ala. 446; 10 Peters 449; 13 ib. 511; 6 Wheat. 119; 3 How. U. S. R. 762; 5 Hill N. Y. 568; 11 Wend. 652; 8 S. & M. 521; 16 Vermont 251.

There is no order of the County Court of Mobile, declaring Mrs. Eslava a lunatic, or person *non compos mentis*. The nearest approach to it is found in the recitals of the order appointing the guardians, and these are wholly insufficient for that purpose. Neither does the record show that she had any notice whatever of the proceedings. They were *ex parte*, and are consequently null and void. McCurry v. Hooper, 12 Ala. 823; 5 Pick. 219; 14 Mass. 222.

In the case of McCurry v. Hooper, *supra*, it was well observed by the judge delivering the opinion of the court: "I think it is a fundamental principle of justice, essential to the right of every man, that he should have notice of any judicial proceeding which is about to be had, for the purpose of divesting him of his property, or the control of it, that he may appear and show to them who sit in judgment on his rights, that he has not lost them by the commission of a crime; and that they should not be taken away from him by reason

of a supposed misfortune. That he has the right to appear before the jury and the court, to show that he is not insane, and that he and his property should not be put in charge of another, is a self-evident truth, and is denied by no legal authority." If this were not so, oppression the most unholy might be visited upon the unsuspecting victims of the cupidity or malice of others, under the forms of law ; and the writ of inquisition authorized by the statute would become indeed inquisitorial in the most offensive sense of that word.

The statute conferring power on that court over this subject is in these words: "It shall be lawful for every Orphans' Court within this State, where any idiots or lunatics shall be within the jurisdiction thereof, to appoint them, or either of them, a guardian, taking bonds with approved security, for the faithful administration of the trust reposed in such guardian, in the same manner as bonds are taken from the guardians of orphans; and such guardian, when so appointed, shall continue during the pleasure of the court, and shall have the same power, to all intents and purposes, and shall be subject to the same rules, orders and restrictions, as guardians of orphans are: such lunacy being ascertained by the inquisition of a jury, by virtue of the writ to be issued by the court to the sheriff of the county for that purpose."

"Inquisitions as to idiots, lunatics, and persons *non compotes mentis*, may be ordered in vacation, or in open court, and made returnable as process of citation. On sufficient cause shown, the judge may order such inquisition to be had before him: in other respects, the same proceedings shall be had thereon as heretofore." Clay's Dig. 302, §§ 29–30. The last section refers to proceedings under the act of 1806, which required a jury of twelve men from the vicinage of the supposed lunatic to be impanneled by the sheriff, a majority of whom might render a verdict without the presence or sanction of the County Court; and which did not authorize such judge to order the inquisition to be had before himself. It does not dispense with the jury, but authorizes the judge, for good cause shown, to have the writ returnable before himself, and the jury to make the inquisition under his supervision and direction.

As the fact of the insanity of Mrs. Eslava had not been ascertained by the Orphans' Court of Mobile, and as it was

suggested alike in the bill of complainant and the answer of Miguel D. Eslava, the Chancellor should have allowed no further proceedings in the case as to her, which could by possibility affect her rights or interest, until he had inquired into the fact of her lunacy. This he had ample power to do, without directing an issue at law for that purpose. Alexander v. Alexander, 5 Ala. 517. If, on such investigation, she should be found *non compos mentis*, he should have appointed a committee or a guardian *ad litem* to watch over her interest and defend her rights.

Again, her right of dower, if any she had, in the premises conveyed by the first mortgage to Lepretre, formed an incumbrance on the fee which that deed purported to convey, and would tend to becloud the title, and consequently might well cause the lands to sell for less than their true value. To prevent this result, Eslava, as mortgagor, and the holders of the mortgage made after those to the complainant, as well as Mazange, the purchaser of the equity of redemption under all the mortgages, are deeply interested; and notwithstanding Mrs. Eslava is allowed a day by the statute to come in and review the decree, after her coverture and disability arising from lunacy have ceased, yet the decree of the court against her right to dower would give confidence to purchasers, and go far to cause the mortgaged premises to sell for their full value. To enable the court to pass on her right, she might properly be made a party, especially on the suggestion of Eslava in his answer; or by the complainant himself, who is interested in making the mortgaged lands bring the amount of his debt. It is evident, from the record in this case, that the Chancellor regarded and treated her as a party to the case in the court below, even in his final decree, and this renders it important to consider whether she was really such under the rules of practice which govern that court; and if she has not been rightly brought in, has the irregularity been waived by her, or by the defendants who have an interest in her becoming a party. That the latter is not the case, admits of no doubt.

It results from what has been said, that Dumie and Mazange, though parties to the original and amended bills of the complainant, were not the legal representatives of the rights and interest of Mrs. Eslava; and as neither bill is so framed as to

make her individually a party, the Chancellor erred in proceeding to a final decree until she was properly brought in. That she was a proper party is abundantly shown by both the original and amended bills, as by each it is sought to subject her dower interest, in the lands mentioned in the two deeds of mortgage, to the payment of the debts secured by them. To the first deed she appears as joint mortgagor with her husband, which is so acknowledged as to pass her dower estate in the land; and to the second, Dumie and Mazange assume to act as guardians, and to pass her interest in the premises by joining with Miguel D. Eslava in its execution.

In neither bill is there any prayer for process against her; but process is prayed for, issued, and executed on Dumie and Mazange as her guardians, and on the original bill a decree *pro confesso* was taken against them in that character.

It is contended, however, that she is not entitled to dower in the lands mentioned in the first mortgage, and consequently was not a necessary party to a bill filed to foreclose it. To this it may be replied, that she was joint mortgagor with her husband, and is charged to be a joint debtor with him, and the complainant, having received a mortgage from her to secure this debt, is not in a situation to excuse his neglect in failing to proceed regularly against her, by setting up her want of interest in the subject of the mortgage; being a party to that deed, she has an unquestionable right to litigate with him the question of her title to the lands conveyed by it. But it is sufficient to say, that complainant considered and treated her as his debtor, and as a party to both mortgages in his original bill, and should have brought her rightly into court, before he could be allowed to proceed further against her.

Nor is this error cured by the subsequent appointment of a guardian *ad litem* to defend for her. As she was not in court, either on the original or amended bill, by service of process under any rule known to our chancery practice, the appointment of such guardian was irregular, and the answer filed by him could not bring her before the court. If she were in truth *non compos mentis*, as both bills allege, she could not waive the irregularity herself, and the Chancellor, who is esteemed the jealous guardian of the rights of such suitors in

his court as are deemed incapable in law to protect their own interests, should not have allowed another to do so for her.

The decree *pro confesso* against Don Gregorio Funes y Munos was regularly taken on notice to him by publication; but as he had not filed an answer, nor in any other manner submitted to the jurisdiction of the court, and as he had received a mortgage on the same lands from Eslava, it was error to render a final decree against him, without requiring the complainant to make the bond provided for by our statute in cases of non-resident defendants who have not submitted to the jurisdiction of the court. Rowland v. Day, 17 Ala. 681; Erwin, Adm'r, v. Ferguson et al. 5 Ala. 158; Clay's Dig. 353 § 45.

The fifth, sixth, fourteenth, fifteenth, nineteenth, twentieth, twenty-first, twenty-second and twenty-fifth assignments of error are not well taken, as the proceedings to which they relate are regular in the court below. The twenty-eighth and twenty-ninth assignments are too general in their character; all assignments of error should point to a particular part of the proceedings of the court below in which the error complained of is thought to exist.

The eighth, ninth and sixteenth assignments may be considered together. We have already seen, that so far as the final decree affects the rights and interest of Mrs Eslava in the mortgage premises, it is irregular, and that it cannot be sustained against Don Gregorio Funes y Munos, as it is absolute in its terms, and he is a non-resident defendant who has not submitted to the jurisdiction of the court. But so far as the parties are concerned who were actually before the court at the time of the rendition of the decree, in form it is free from error. It was held by this court in the case of Tickner v. Leavin's Ex'r, 2 Ala. 149, that in a case where the defendants are adults, it is not error to decree a sale of the mortgaged premises without ascertaining, by a report of the master, whether the amount due might not have been raised by a sale of a part of the mortgage premises, unless it be suggested that such reference is proper. If the adult defendants stand by, without suggesting that the value of the mortgaged estate exceeds greatly the amount of the debt secured by the mortgage, and that the premises are capable of sub-division, and moving for a refer-

ence to the master to ascertain the facts, and report upon the subject, the Chancellor may well go on and decree a sale of the whole; and this, notwithstanding there are two mortgages, as they are between the same parties, for the same debt, and differ only as to the premises conveyed.

A different rule would prevail, if any of the defendants were infants, persons *non compotes mentis*, or, indeed, laboring under any legal disability to appear themselves, and contest the matter with the complainant. In all such cases, the Chancellor will extend to them every protection of which an adult could avail himself by the rules which regulate proceedings in courts of equity. Mills v. Dennis, 3 Johns. Ch. R. 367. If he failed to do so, it would be error.

It may be, also, that, where there are two mortgages, in favor of different mortgagees, on a part of the mortgaged premises, and one only of the mortgages extends to the other portion, he would compel the latter mortgagee to exhaust the estate which was exclusively devoted to the payment of his debt, before he would foreclose, in favor of such mortgagee, as to the premises contained in both mortgages. So, also, if the mortgagor had sold and conveyed his equity of redemption in one parcel, and retained it in the other, the Chancellor would first foreclose and sell that portion in which the mortgagor retained the equity, before he would sell the other. For it is well settled, that, where one creditor has two securities for his debt, and another but one, and that is common to them both, the former will be compelled first to exhaust the security which is exclusively his own, before he will be allowed to proceed against the one which is common to each. This question, however, does not arise in this case, as the mortgage to Don Gregorio Funes y Munos covers the entire premises described in both the mortgages to the complainant; and Mazange is the purchaser of the equity of redemption in the whole estate mortgaged. Had the parties been regularly before the court when the final decree was made, no just exception could be taken to that portion of it which directs a sale of the lands if the mortgage debt was not paid by the 30th of April. It is discretionary with the Chancellor to allow time for the payment of the sum reported by the master to be due. He may, if he will, decree a

foreclosure and sale absolutely, without giving day to the mortgagor, and such decree will be free from error.　Mussina v. Bartlett, 8 Por. 277.

The sixth, seventh, tenth and eleventh assignments of error may be considered together, as they each have relation to the orders of reference made at different times by the Chancellor. The objection to the decree and order of reference made at the December term, 1850, is well taken, because Deas, who was made a party to the amended bill, was not before the court by service of subpœna, or by service perfected in any other manner whatever,, at the time that decree and order were made.　He is represented in the bill as a resident of the State, and the subpœna issued against him is returned not found.　It is irregular, in a chancery proceeding, to take any order generally affecting the merits of the case, until it is at issue as to all the parties.　This is not excused by the supposition that the party not before the court is not a necessary one; it is enough that he is represented by the bill as having some interest in the subject matter of the suit, and is regularly made a party by proper allegations, and prayer for subpœna to bring him in.　The same irregularity extends to the order of reference made subsequently at the hearing.

It is unnecessary to examine the other errors assigned in relation to the points of practice and pleading, as, in almost every instance in which they can avail the plaintiffs in error, they derive their availability from their connection with the irregularities already examined.

As the case must be sent back to the Chancery Court for further proceedings, it may not be amiss to examine the ruling of the Chancellor on the merits.

We fully agree with him, that Mrs. Eslava is not entitled to dower in the lands mentioned in the first mortgage to Lepretre.　It appears that these lots were sold by him to M. D. Eslava, and a deed made to the latter on the same day on which the mortgage was executed; the two deeds were, therefore, contemporaneous acts.　"To entitle the wife to dower of lands owned by her husband during coverture, he must not only be seized, but the land must vest in him beneficially for his own use.　He must not be the mere conduit for passing the title to another.　Nor is the seizin sufficient, when

the husband takes a conveyance in fee, and at the same time mortgages the land back to the grantor, or to a third person, to secure the purchase money in whole or in part. Dower cannot be claimed against rights under the mortgage. The husband is not deemed sufficiently or beneficially seized, by such an instantaneous passage of the fee in and out of him, as to entitle his wife to dower against the mortgagee. A widow in this case, on foreclosure of the mortgage, and sale of the mortgage premises, will be entitled to her claim to the extent of her dower in the surplus proceeds after satisfying the mortgage; and if the heir or the owner of the equity of redemption redeems, or she brings her writ of dower, she is let in for her dower, on contributing her proportion of the mortgage debt." 4 Kent's Com. 38; 4 Mass. 566; Clarke v. Monroe, 14 ib. 351; Bogie v. Rutledge, 1 Bay 312; Stow v. Tifft, 15 Johns. 458; McCauley v. Grimes, 2 Gill & Johns. 318; Eilliam v. Moore, 4 Leigh 30.

As to the land, however, conveyed by the second mortgage to Lepretre, it is clear that her right to dower, if she survive her husband, is good, and can be in no wise impaired by the act of Dumie and Mazange, who became parties to that deed in the pretended capacity of her guardians, and as such undertook to pass her claim of dower to the mortgagee. We have seen that their appointment is absolutely void; and were it otherwise, I apprehend, the guardians of a lunatic wife can have no authority to relinquish her dower in the real estate of her husband. The statute which authorizes the appointment of such guardians provides, that they "shall have the same powers, to all intents and purposes, and shall be subject to the same rules, orders and restrictions as guardians of orphans." Clay's Dig. 302, § 29. An ordinary guardian has no authority of his own mere will to sell the real estate of his ward; he could not thus pass the title, and such a sale would be a nullity. "With regard to the real estate it may be observed, that the guardian has no further concern with, or control over it, than what relates to the leasing of it, receiving the rents and profits, and keeping it in order. He may lease it, but the lease must not extend beyond the time when the ward will be of full age." 1 Bouvier's Inst. 143, 144; Ross v. Gill, 4 Call, 250; Truss v. Olds, 6 Rand. 256;

Jones v. Ward, 10 Yerg. 160; Genett v. Tallmadge, 1 John. Ch. Rep. 561; Shook v. Sutton, 5 Halst. 133. Again, the requirements of the statute in relation to the mode by which the wife is to relinquish her dower in the real estate of her husband, conveyed by him during coverture, effectually forbid the idea that such relinquishment can be made by any person except herself. It is required that she should be examined privately and apart from her husband, and that, on such examination, she shall acknowledge that she makes the relinquishment "as her voluntary act and deed, freely, without any fear, threats, or compulsion of her husband." Neither a guardian, nor an agent, can comply with the requisitions of this act; and consequently it may be safely held, that none but the wife, in person, can relinquish her claim to dower in the lands of her husband, aliened during coverture.

The next question presented arises out of the settlement between Lepretre and Eslava, in 1845, out of which sprung the second mortgage and the note, the payment of which is secured by it. It is for the sum of $23,402$\frac{29}{100}$, and it is insisted by Eslava that, in making up this sum, compound interest was charged and allowed. The governing principle acted upon in matters of mortgage by the courts of equity is, that the mortgagee shall be entitled only to principal, interest, and costs; and it protects the debtor with peculiar jealousy against any attempt on the part of the mortgagee, by taking advantage of the necessities of the mortgagor, to impose on him harsher terms. Acting on this principle, equity has held, that an agreement entered into at the time of the loan, for converting interest into principal, from time to time as it shall become due, is oppressive and unjust, and tending to usury, and consequently it cannot be supported. But when interest has once accrued due, it becomes a debt. There is no longer, therefore, any objection to an agreement *inter partes*, that it shall be considered principal, and thenceforth carry interest. Indeed, it would be injurious to the mortgagor to establish the contrary, as it would remove an inducement to the mortgagee's permitting his principal to remain, and, consequently, equity has recognized such agreement; but there must be no extortion on the part of the mortgagee, or otherwise equity will interpose for the relief of the mort-

gagor.   Brown v. Barkham, 1 Pr. Wms. 654; Thornhill v. Evans, 2 Atk. 330; Coote on Mort. 431, marg.

Equity considers the arrears of interest so converted into principal by agreement between the parties, in the light of a further advance, and when, as in this instance, there was no other charge or incumbrance on the estate of which the mortgagee had notice, at the time of such agreement and settlement, it will be allowed to be tacked to the first mortgage, and there can be no objection to its forming a part of the consideration for the second. 3 Pow. on Mort. 911 (Rand's edition); Pawling v. Pawling, 4 Yeates, 220; Barclay v. Kennedy, 2 Wash. C. C. Rep. 350; Digby v. Craggs, Amb. 612; Greenleaf v. Kellogg, 2 Mass. 568; Coote on Mort. 431, marg.

It is also well settled, that, in case interest runs in arrear, and in the mortgagee's account of arrears rests are made from time to time, on which interest is calculated, and ultimately a general account of all arrears, calculated on the footing of those rests, is signed by the mortgagor, and confirmed by a deed, although executed after a lapse of several years, for securing the balance, the transactions are not usurious, and the mortgagor is liable.   Blackburn v. Warwick and wife, 2 Younge & Col. 92.   In the present case, the settlement on the basis of rests in the account, and interest compounded on such rests, formed the basis on which the note for $23,402$\frac{29}{100}$ and the mortgage of 1845 were executed by Eslava, and as he has thus sanctioned it, and there was no coflicting lien or subsequent incumbrance on the property at the time of this settlement, he will not be allowed to complain of it, and the court will charge the mortgaged premises with the payment of the sum so found due.

The agreement, however, of the 4th February, 1845, by which Eslava agrees that Lepretre shall be allowed to compound the interest on the mortgage debt, annually, for the term of four years, at the rate of 8 per cent., does not deserve the favor of a court of equity, and will not be enforced. It has been before remarked, that a court of equity regards with jealousy all arrangements made between the mortgagor and mortgagee, by which the latter obtains an advantage over the former not stipulated for in the mortgage deed itself. And while it will permit the mortgagee to state his account

for interest past due, allowing rests, and compounding the interest at each rest, if they are not too frequent, considering the interest accrued already as a further advance; yet, acting on the principle that the parties do not deal on terms of strict equality, equity has held, that an agreement entered into at the time of the loan, for converting interest into principal from time to time as it shall become due, is oppressive and unjust, and tending to usury, and that, consequently, it cannot be supported. Mitford v. Featherstonhaugh, 2 Vesey, 445; Ossulston v. Yarmouth, Salk. Rep. 449; Chambers v. Goldwin, 9 Ves. 271; Coote on Mort. 433, 434. The agreement under consideration comes under the rule laid down in these and numerous other cases, and the complainant cannot be allowed to set it up and enforce it against Eslava.

We regard the other agreement of the same date, by which Eslava, in consideration of his inability to pay the debt to Lepretre, and as an indemnity to the latter for the difference between the amount of interest allowed by the laws of this State on the debt of Eslava to him, and that which Lepretre was paying on money borrowed in Louisiana, binds himself to pay the additional interest of 2 per cent. per annum, over and above the 8 per cent. allowed by law, as rightly set aside by the Chancellor. It is both oppressive and unjust, and deserves no favor at the hands of a court of equity.

We agree, also, in the conclusion of the Chancellor, that, on a reference to the master, the amount of the debt secured by the second mortgage should be taken as the basis of the account, and as the true sum due from Eslava to Lepretre at that date, which is properly chargeable on the mortgage premises. We perceive, however, that in setting down the amount of this note in his directions to the master, the Chancellor has stated it to be $23,502 29, instead of $23,402 29, as it is shown to be in the record and mortgage. He was doubtless betrayed into this error by the fact, that the former is abundantly proved to be the amount which was really due to Lepretre at the time the note was executed, but, through mistake, both the note and mortgage are for one hundred dollars less. The sum thus omitted through mistake cannot be considered as a part of the mortgage debt, to charge its payment upon the lands conveyed, especially as the rights of

a subsequent mortgagee, and a purchaser of the equity of redemption have intervened before the mistake was discovered and corrected.

We think, also, that on the accounting Eslava should be allowed a credit for all sums paid by him in good faith for filling up, walling, &c., the lot of Lepretre, mentioned in the pleadings and proof, less whatever amounts may have been received by him, and are unaccounted for, of rents and profits arising out of said lot. The proof is ample, that he had Lepretre's authority to make the expenditure, and the latter should not now be allowed to repudiate it.

It remains only to be said, that, for the errors hereinbefore noted, the decree must be reversed, and the cause remanded.

It may not be amiss to add, that, on the cross error assigned by Lepretre, no reversal could take place, as his only complaint is, that the amount of money which the decree ascertains to be due to him on the mortgage was too small, when it is evident, from our ruling on the errors assigned by the defendants, it is greater than it will be found to be when the error of $100 is corrected, and Eslava is allowed a credit for the money expended in filling up the lot mentioned in the pleadings and proof.

CHILTON. J.—I concur in the reversal of this cause; but as to that portion of the opinion delivered by my brother Ligon which asserts the necessity of making Mrs. Eslava a party, under the facts disclosed in this record, I am constrained to differ.

It is clear, from the whole case made by the pleadings and proof, that the only interest Mrs. Eslava had in the litigation was, as the wife of the mortgagor, signing the mortgage with her husband, by way of relinquishing her dower.

In my opinion, the Chancellor could not, by any decree that could have been rendered, affect the wife's right to dower, should it ever be consummated by the death of her husband. The law prescribes the manner in which she may relinquish her right, and the Chancery Court has no power, upon her defective voluntary relinquishment, to aid it in any way. If her supposed right to dower constituted a cloud on the title, and the Chancellor could not, by his decree, remove

it, there was no necessity for her being brought in merely that the Chancellor might express an opinion as to whether her right of dower attached to the mortgaged premises or not. The court will not do a useless thing; and it would but delude purchasers, instead of removing a cloud from the title, should the Chancellor be of opinion the wife had no dower, when in fact she had such inchoate right; for they would naturally repose upon the opinion as binding the parties, when it would have no such effect. A party may go into chancery, in many cases, to disencumber estates, so as to prevent sacrifices upon their sales by reason of some alleged incumbrance or opposing title. But this jurisdiction only obtains where the court has the power to remove the cloud which casts a shadow over the estate of the complainant.

I apprehend the court, in the absence of all power to decree in reference to the alleged incumbrance, will never take jurisdiction merely for the purpose of giving an opinion which cannot be binding upon the parties. The court, in this case, so far as Mrs. Eslava was concerned, could have done nothing more; and hence I conclude that there was no necessity whatever for Mrs. Eslava being brought before the court, and that the Chancellor did not err in proceeding in her absence.