STANFORD, RESPONDENT, v. CORAM, APPELLANT.

(No. 1,373.)

(Submitted November 15, 1901.   Decided February 24, 1902.

*Banks and Banking—Bills and Notes—Guaranty—Persons Bound — Construction — Validity — Compound Interest— Discharge of Guarantor—Payment by Principal Debtor— Change in Principal Debtor—Demand—Waiver.*

1. Where, in an action on a contract whereby the record stockholders of a bank guarantied the payment of notes, the ledger of the bank showed defendant's name as a stockholder, and it appeared that he and another executed the contract of guaranty on behalf of themselves and other stockholders, the court was justified in finding that defendant was a record stockholder; for the ledger itself was *prima facie* evidence of that fact, requiring defendant to rebut the same.

2. A contract guarantying the payment of notes, not calling for compound interest, which provides that the holder may renew the notes without the consent or knowledge of the guarantors, though contemplating that at the renewal of the notes the accrued interest, if not paid, shall either become a part of the principal or an independent obligation drawing interest, is not void as an antecedent agreement for the payment of compound interest.

3. Though an antecedent agreement to pay interest on interest to become due is void, parties may substitute a new note for an old one which is due, and incorporate in the new one accrued interest remaining unpaid; and hence a guarantor of a note and renewals will be required to pay interest on the accrued interest unpaid at the time of the renewal and made a part of its principal.

4. Civil Code, Sec. 2587, providing that parties may contract in writing that unpaid interest shall become a part of the principal and draw interest, does not affect notes or agreements made before its adoption in 1895.

5. A party guarantying a note and renewals cannot be relieved of his obligation to pay interest and attorney's fees, as provided by a renewal note, on the ground that his burden has been increased, when the evidence does not show that the original note did not contain such provisions; for it will be presumed that the original and renewal notes contain the same provisions.

6. A company executed its note to a bank, its creditor, and deposited a note from an individual debtor as collateral, who was also a debtor on a note to the bank. The company's note was assigned to plaintiff under a guaranty of payment by the stockholders of the bank. The collateral was not delivered to the plaintiff, and its existence was unknown to him. A stockholder of the bank, while acting as agent of other stockholders and as cashier of plaintiff, received a payment from the individual debtor on the collateral note and on the note payable to the bank. The money so received was first applied on the note to the bank, and the remainder was endorsed on the collateral; but no credit was made on the company's note assigned to plaintiff. *Held,* that plaintiff was not bound by the knowledge of its cashier, nor responsible for the misappropriation of the collateral note; he having no knowledge of its existence, except through the knowledge of his

cashier, which could not be imputed to him in a transaction in which the cashier was not acting as his agent, but antagonistic to him.

7.  A finding that a demand has been made upon a guarantor to pay a note guarantied by him, though not supported by plaintiff's evidence that the guarantor stated that suit would have to be brought before he would pay, is harmless error; for the evidence warrants a finding that the guarantor waived a demand.

8.  The law does not require a useless thing, hence, when one unqualifiedly refuses to perform his obligation he thereby waives the necessity of a demand before bringing suit.

9.  A principal debtor executed his note to his creditor, a bank, and the latter assigned the same to plaintiff bank, under a guaranty by the stockholders of the payee to pay it. The note was thereafter renewed and made payable to the cashier of plaintiff, and indorsed to plaintiff, and carried as bills receivable. The original note was secured by real estate and chattel mortgages. The renewal note was secured by a real estate mortgage executed to plaintiff's cashier. Plaintiff's records did not disclose the existence of the mortgage. The cashier accepted as payment of the note a conveyance to him of the mortgaged property, and canceled the note and delivered it to the principal debtor. The cashier executed his own note to plaintiff for the amount of the debt, which note was credited against the debtor's note as payment, and was treated as an asset of plaintiff. The cashier informed plaintiff's vice president that he was going to take the debtor's property in payment of the note. The vice president knew of the cashier's note, though he claimed to have no knowledge of the mortgages securing the principal debtor's note. Plaintiff did not object to, nor repudiate the cashier's acts. The original payee went out of business, and plaintiff's cashier had charge of the settlement of its affairs, but was not authorized to act in any capacity for its individual stockholders. Plaintiff did not offer to return to the cashier his note. No demand was made upon the debtor for the payment of the note after its surrender to him. *Held,* that the evidence showed that the debtor's note was paid and discharged by the conveyance of the real estate to plaintiff's cashier, and hence the guarantying stockholders were discharged from liability.

10.  Under Civil Code, Sec. 3650, providing that a guarantor is exonerated, if by an act of the creditor without his consent the original obligation of the principal is altered, or the remedies or rights of the creditor against the principal are impaired, a guarantor of the payment of a note is relieved from liability when the holder's cashier, with the holder's knowledge, accepts as payment from the principal debtor a conveyance of land, and cancels the note, and himself executes a note to the holder for the amount of the debt of the principal debtor.

*Appeal from District Court, Cascade County; J. B. Leslie, Judge.*

ACTION by James T. Stanford, as receiver of the Northwestern National Bank of Great Falls, Mont., against Joseph A. Coram and another. Judgment for plaintiff, and defendant Joseph A. Coram appeals. Affirmed in part and reversed in part.

*Messrs. Clayberg & Gunn,* for Appellant.

*Mr. M. M. Lyter* and *Mr. A. C. Gormley,* for Respondent.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

In the spring of 1894 the Globe National Bank, theretofore doing business at Kalispell, Mont., went into liquidation. At that time it held certain promissory notes, which, it seems, were not then due, viz.: One made by the Libby Townsite & Lumber Company for $9,006.02; one made by Oullette & Therriault, copartners, for $3,742.82; and a third, made by one John Weitman and Kate Weitman, his wife, for $6,522.24. Wishing to obtain in cash the amounts called for by these notes, the authorities of the bank, through their agent, B. D. Hatcher, who had charge of the business of the bank, assigned them to the Northwestern National Bank of Great Falls, Mont., which thereupon advanced the full amount of them in cash. To protect the Northwestern National Bank against possible loss by reason of the accommodation thus extended to the directors and agents in charge of the affairs of the Globe National Bank, the defendants, for and on behalf of the persons whose names then appeared of record as stockholders of the latter, executed and delivered to the former the following writing:

. "Whereas, the Globe National Bank of Kalispell, Montana, and the Northwestern National Bank of Great Falls, Montana, have arranged to consolidate and do business in the name of the Northwestern National Bank of Great Falls, Montana, the Globe National Bank of Kalispell having decided to disincorporate; and

"Whereas, the said Globe National Bank, through its agents and directors, is desirous of transferring to said Northwestern National Bank certain of its assets consisting of notes and obligations owing it by the Libby Townsite & Lumber Company, the Kalispell Water & Electric Company, John Weitman, and Oullette & Therriault, each being separate obligations, and amounting in the aggregate to a sum exceeding twenty-two thousand dollars, and is desirous of having said Northwestern.

National Bank accept each and all of said notes and obligations at their face value, and credit the said Globe National Bank and its owners with same as so much cash; and

"Whereas, the officers and directors of the said Northwestern National Bank demand that said notes and obligations be further secured before they are willing to accept same under the conditions named:

"Now, therefore, in consideration of the said Northwestern National Bank, through its officers and trustees, accepting said notes and obligations as so much cash, and at their face value, the persons whose names appear of record as the stockholders of the said Globe National Bank on June 24, 1894, do hereby, through their agents and attorneys in fact lawfully authorized so to do, guaranty the payment of each and all of said notes and obligations, and further expressly agree that said notes, or any one or more of them, may be renewed or extended at such times, under such conditions, and as often and for such time or times as the officers or agents of said Northwestern National Bank may deem proper or choose, and all without the further consent or knowledge of the guarantors or their agents; or any of them; and it is further expressly agreed that this guaranty shall extend to such renewals as long as any one of said obligations, or any part thereof, remain unpaid.

"This agreement is meant to be a full guaranty on the part of said stockholders of said Globe National Bank that the debts above specified will be paid in full, and the guarantors herein, through their agents or attorneys in fact, J. A. Coram and B. D. Hatcher, promise and agree that if said notes, or any of them, are not paid when payment thereof is demanded of the principals therein by the said Northwestern National Bank, then upon demand by said bank the guarantors herein will pay each and all of the same.

"For the faithful performance of the conditions of this guaranty, said guarantors, through their said agents and attorneys

in fact, bind themselves severally and jointly, their heirs, executors, administrators, and assigns, firmly by these presents.

"Dated this 27th day of June, 1894.

"[Signed]

"J. A. CORAM, Agent and Attorney in Fact.

"B. D. HATCHER, Agent and Attorney in Fact."

At the time the Globe National Bank went out of business, B. D. Hatcher, one of the defendants, was its cashier, and thereafter acted as the agent of the directors and stockholders in settling up its affairs. While engaged in this business he was also employed as cashier of the Northwestern National Bank, and continued to act for it in this capacity until February 5, 1897, when it also closed its doors and went into the hands of a receiver. The plaintiff was appointed its receiver on May 5, 1897. Meantime the three promissory notes heretofore mentioned had been renewed from time to time; in each instance the interest due and not paid being added to the principal, and the renewal note including both interest and principal. All these renewal notes were made payable to the Northwestern National Bank, and contained a provision for reasonable attorney's fees. This action was brought against the defendants upon the written guaranty quoted above, the complaint alleging previous demand upon both the makers and the defendants as guarantors.

Each of the notes is the basis of a separate cause of action. The defendant Hatcher suffered judgment by default. The defendant Coram appeared and filed his answer, in which various defenses are interposed, some of which apply to all of the demands, while others apply to some particular one of them. Their nature will be apparent from a discussion of the contentions made by appellant. The cause was tried by the court without a jury, and from the evidence adduced the court found all the issues in favor of the plaintiff, and caused to be entered a judgment in his favor for the principal sums specified in the notes, with interest and costs, including attorney's fees. From

the judgment, and an order denying him a new trial, defendant
Coram has prosecuted his appeals to this court.

1.  One of the issues presented by the pleadings is whether
the defendant was a record stockholder of the Globe National
Bank on June 24, 1894.  Contention is made that the evidence
does not support a finding in favor of plaintiff on this issue.
It appears that when the bank closed its doors, in the spring of
1894, Hatcher, who had been its cashier from the time at which
it began business in 1892, retained all its books of account and
other records as agent of the directors and stockholders to wind
up the business.  In May of that year he became the cashier
of the Northwestern National Bank.  He thereupon employed
one Wininger, an attorney residing at Kalispell, to close up the
business, and delivered to him the books and records.  He re-
tained them for some months, and sent them to Hatcher at
Great Falls.  They were found among the records of the North-
western National Bank when plaintiff became its receiver.  They
were in the same condition at the trial as when they came into
the possession of Wininger.  Among them was the stock ledger,
all the entries in which were in the handwriting of Hatcher.
The list of stockholders in this book included the name of the
defendant Coram.  It is admitted in the pleadings that he was
a stockholder, and Hatcher, who was examined as a witness,
testified that he and defendant Coram guarantied the payment
of the notes mentioned in the complaint on behalf of them-
selves and other record stockholders of the bank.  These facts
are amply sufficient to sustain the finding.  When it was made
to appear from the ledger, which was identified as the record of
the bank, that the defendant's name was in the list of stock-
holders referred to in the contract of guaranty, the burden was
cast upon him to rebut the *prima facie* case thus made against
him.  This he did not attempt to do.  Though he gave his
deposition, which was read at the trial, he did not refer to the
matter at all.

2.  The contention is made that no recovery can be had upon
the notes in this action, for the reason that they embody a

promise to pay compound interest, and are therefore void. It is also said that, even if they are not void, no recovery may be had upon them for any amount in excess of the principal sums named in the original notes payable to the Globe National Bank, with simple interest at the rate specified therein up to the date of judgment. This contention proceeds upon the theory that it is the rule in this state that contracts to pay compound interest are void, as being against public policy and good conscience. The notes themselves, which are copied in the record, do not provide upon their face for the payment of compound interest; nor does the evidence show that any of the renewal notes executed from time to time after the assignment of the original notes contained any stipulation on this subject. They are, therefore, not obnoxious to the objection urged against them.

Coram agreed that, if the Northwestern National Bank would accept the original notes as cash, he would upon demand pay them, in case they were not paid upon demand upon the makers. He also agreed that they might be renewed "at such times, under such conditions, and for such time or times as the officers or agents of the said Northwestern National Bank might deem proper, and all without further consent or knowledge of the guarantors," etc. This stipulation in the contract contemplated conditions under which the makers might obtain such accommodations from the assignee as they might have obtained from it, had it been named as payee in the first instance. Under these circumstances it was fairly within the contemplation of the parties that at each renewal the interest should be paid, and the note renewed for the amount of the principal, or that the interest should, when due and the parties should so agree, be converted into principal and be incorporated in the new note. Otherwise, the only purpose to be served by the stipulation for renewal would seem to be to avoid the bar of the statute of limitations in case the notes were not paid within the prescribed limit. If the purpose of this stipulation was to substitute the Northwestern National Bank in place of the Globe National Bank as payee—which we think was the case—

then we are to understand that the parties to the contract intended that the Northwestern National Bank, as between itself and the makers, should treat the loans as if made by itself in the first instance. The contract of guaranty does not upon its face specifically provide for the payment of compound interest by way of an antecedent agreement. The question, therefore, for decision, arises upon the second branch of the contention, and is: After interest is due, may it lawfully be treated as a debt, and be converted into interest-bearing principal, either in the form of a separate obligation or by addition to the original principal? In either case the result is the same; for if the interest due may not lawfully be added to the principal, and the whole be incorporated in the new obligation, then it would be equally unlawful to convert it into a separate interest-bearing obligation. The defendant insists that either is unlawful under the rule declared in the decisions in this state, and cites *Wilson* v. *Davis,* 1 Mont. 183; *Curtis* v. *Valiton,* 3 Mont. 153, and *Palmer* v. *Murray,* 8 Mont. 174, 19 Pac. 553. In *Wilson* v. *Davis* the territorial supreme court had under consideration a promissory note which provided on its face for the payment of compound interest, and it was held that, though the contract was not void, yet the stipulation in advance for the payment of compound interest would not be enforced. This is an authority, therefore, for the position that neither in equity nor at law will an antecedent agreement to pay interest on interest to fall due in the future be enforced; but it is not held therein that it is against public policy for the parties to substitute a new obligation for the old one when it has fallen due, and incorporate in the new one by an agreement then made any unpaid interest, or to convert such interest into a separate interest-bearing obligation. The case of *Curtis* v. *Valiton* is founded upon *Wilson* v. *Davis,* but seems to go further and declare generally that an agreement to pay interest on interest will not be enforced in any case, no matter whether the agreement be an antecedent one or not. A careful examination of it, however, shows that the territorial supreme court was of the

opinion that the question involved in the case was the same as the one decided in Wilson v. Davis, and that it was concluded by the decision in the earlier case; for in Curtis v. Valiton the court proceeded upon the theory that the oral agreement for the payment of compound interest, being made at the time the original obligations were executed, was void, because it fell within the rule declared in Wilson v. Davis. The question presented here seems not to have been the subject of serious consideration. The case is therefore to be distinguished from the present case, and is not an authority in point. Both these cases are authority for the proposition that a contract for the payment of compound interest is not void in toto, but will be enforced to the extent of requiring payment of the principal and simple interest at the legal or stipulated rate. The case of Palmer v. Murray was an action for conversion. Upon a trial the jury rendered a verdict for the value of the property involved at the time of the conversion, with interest to the date of the judgment. Judgment was thereupon entered for the full amount of recovery, with interest. Inasmuch as the judgment itself would thereafter bear 10 per cent. interest, this court upon appeal held that the judgment was erroneous, in that it provided for compound interest, and struck out that portion of the verdict made up of interest on the original value of the property. On a rehearing (8 Mont. 312, 21 Pac. 126), while adhering to the former ruling that the interest allowed by the jury should be stricken out, the court expressly overruled its former decision in so far as it held that the interest properly recoverable in any case could not be capitalized in the judgment. Since the decision in that case it has been the invariable rule in this state that, whenever interest is properly recoverable in any action, it may be capitalized in the judgment, so as to draw interest from the date of the judgment.

The foregoing cases show the condition of the law in the territory and state until the adoption of the Code of 1895, which overturns the rule established by these cases by a specific provision that parties may contract in writing for the payment of

compound interest. (Civil Code, Sec. 2587.) Previous to 1895 there was no provision in the statutes upon the subject of usury, and parties were at liberty to fix the rate of interest by convention. If no rate was thus fixed, the statute fixed it for all cases in which interest was recoverable. Since the contract under consideration was made prior to the adoption of the Code of 1895, the provision cited is not applicable, and its validity must be governed by the principles which we find recognized and applied in the decisions of other states.

There is nothing in such a contract inherently wrong, or in violation of any principle of public policy or good conscience. When interest falls due, it becomes a debt, just as the principal is a debt. The debtor may pay the whole debt, or, if he choose and his creditor is willing to grant it, obtain forbearance. In this case the transaction is equivalent to a new loan, whether the interest be capitalized in a new obligation for the whole amount or a separate obligation be given for the interest. If a separate obligation be given for it, embodying a provision for interest, the forbearance obtained is a good consideration for such interest, just as an agreement to pay interest upon any other character of indebtedness is supported by an agreement on the part of the creditor to forbear. So, if the interest be capitalized with the original principal, the result is exactly the same. The transaction is so cleary lawful, in the absence of a statutory prohibition, that it scarcely admits of disucssion. It is supported by the overwhelming weight of authority. (*Porter* v. *Price,* 80 Fed. 655, 26 C. C. A. 70; *Eslava* v. *Lepretre,* 21 Ala. 530, 56 Am. Dec. 266; *Camp* v. *Bates,* 11 Conn. 487; *Meeker* v. *Hill,* 23 Conn. 577; *Ellard* v. *Mortgage Co.,* 97 Ga. 329, 22 S. E. 893; *Thayer* v. *Mining Co.,* 105 Ill. 540; *Niles* v. *Commissioners,* 8 Blackf. 158; *Otis* v. *Lindsey,* 10 Me. 315; *Wilcox* v. *Howland,* 23 Pick. 167; *Hoyle* v. *Page,* 41 Mich. 533, 2 N. W. 665; *Mason* v. *Callender,* 2 Minn. 350 (Gil. 302), 72 Am. Dec. 102; *Perkins* v. *Coleman,* 51 Miss. 298; *Young* v. *Hill,* 67 N. Y. 162, 23

Am. Rep. 99.)   From neither point of view, therefore, can the contention of the defendant be sustained.

3.   Defendant insists that he is not liable to pay the notes in suit, for the reason that, by the incorporation of the interest in them and the provision therein for attorney's fees, a change has been effected in them without his consent, thereby increasing the extent of his burden under his contract beyond what is fairly contemplated by its terms.   As we have already seen, however, it was contemplated by the parties that the notes should be renewed upon such terms and conditions as could be mutually agreed upon by the makers and the assignee.   The terms of the renewals were both lawful and reasonable.   Furthermore, the evidence does not tend to show that the original notes did not contain a provision for attorney's fees.   In the absence of such evidence, the presumption must be indulged that they did, even though we concede the position of counsel that the guaranty did not contemplate the addition of such a condition to the new notes.   The court could not presume that the bank exacted conditions from the makers which were not authorized by the guaranty.   There is no merit in the contention.

4.   The note of the Libby Townsite & Lumber Company grew out of the following transaction:   In 1893 one Mumbrue obtained a contract from the United States to survey certain public lands in the vicinity of Libby, Flathead county.   It was agreed between him and the company, through one Leonard, its secretary, that the company would furnish funds to pay the expenses of the survey, and that Mumbrue would reimburse the company out of the funds paid him by the United States upon completion of the contract.   The company was also to share in the profits, if any, made under the contract.   Leonard then arranged with the Globe National Bank for a loan of funds to the company from time to time as they were needed.   This arrangement was carried out until the indebtedness of the company to the bank on this account amounted to something over $2,000.   The bank authorities, not desiring to furnish any

more funds to the company, thereupon arranged with Mumbrue to furnish directly to him such assistance as he required; he agreeing to secure the bank by turning over to it his claim against the United States. Thereupon the company executed its note to the bank for the funds already advanced upon the contract, and included therein other indebtedness due from the company, making the amount of the note, which, after renewal from time to time, was assigned to the Northwestern National Bank. At the same time Mumbrue executed his note to the company for the amount of the advancements made to him under the first arrangement. This note was assigned to the bank by the company as collateral to secure its own note. When the assignment of the latter was made to the Northwestern National Bank, the collateral was retained by Hatcher, as agent of the directors and stockholders of the Globe National Bank, and its existence was not actually known to the officers of the Northwestern National Bank. In the latter part of 1894, Hatcher then being the cashier of the Northwestern National Bank, and still acting as the agent of the stockholders of the Globe National Bank, received from Mumbrue a draft for $8,200. This he applied, first, to the payment of the debt due from Mumbrue for advancements, and then to this note, assigned by the Libby Townsite & Lumber Company as collateral security. No credit for the amount of the Mumbrue note was made upon the note of the company, but all the funds derived from Mumbrue's payments went into the assets of the Globe National Bank and were used in liquidating its other indebtedness. It is argued by counsel that as Hatcher was the cashier of the Northwestern National Bank at the time the contract of guaranty was made, and had knowledge of the existence of the collateral security, as well as of the subsequent payment of it by Mumbrue, this knowledge should be imputed to the bank, his principal, and that it should be held responsible for the misappropriation of the collateral, resulting in detriment to the defendant. For this reason, the defendant insists, a credit for the amount of the Mumbrue note must be allowed him on the

note of the corporation as of the date of the misappropriation by Hatcher.

Counsel relies upon the general rule that notice to the agent is notice to his principal of all matters connected with the business of the principal which fall within the scope of the agent's authority. Without pausing to inquire whether the general rule should be extended to cases where the knowledge of the agent has been acquired prior to his employment, but reserving this question, we think that, under well-established principles of the law of agency, the knowledge possessed by Hatcher should not be imputed to the bank. The presumption that the agent has imparted his knowledge to his principal does not prevail where the agent is acting in his own or another's interest, and adversely to that of his principal, particularly when the agent is acting, not as agent, but openly and avowedly for himself. In such case, by reason of his antagonistic attitude toward the interests of his principal, the presumption does not arise that he has communicated his knowledge to his principal, but that, on the contrary, he has refrained from so doing from motives of self-interest. (Mechem on Agency, Sec. 723; 1 Am. & Eng. Enc. Law (2d Ed.), 1145; *Frenkel* v. *Hudson,* 82 Ala. 158, 2 South. 758, 60 Am. Rep. 736; *Wickercham* v. *Zinc Co.,* 18 Kan. 481, 26 Am. Rep. 784; *Allen* v. *Railroad Co.,* 150 Mass. 200, 22 N. E. 917, 5 L. R. A. 716, 15 Am. St. Rep. 185; *Innerarity* v. *Bank,* 139 Mass. 332, 1 N. E. 282, 52 Am. Rep. 710; *In re Plankinton Bank,* 87 Wis. 378, 58 N. W. 784; *Hickman* v. *Green,* 123 Mo. 165, 22 S. W. 455, 27 S. W. 440, 29 L. R. A. 39; *Third National Bank* v. *Harrison* (C. C.), 10 Fed. 243.)

The facts detailed above show that Hatcher in making the contract was acting for himself and the other record stockholders of the Globe National Bank, and adversely to the North-Western National Bank. When he went into the employment of the latter, the affairs of the other bank and its stockholders were mere private matters, about which his employer was not in any way interested; and, when he came to deal with his em-

ployer, he was for the time being acting, not as its *alter ego,* but as a third party, and it could not then, or afterwards, so long as he was acting in the same capacity, be affected by any knowledge possessed by him. The subsequent misappropriation of the money he obtained from Mumbrue was but a part of the original transaction, in which, for whatever reason, he retained the security, intending, no doubt, to appropriate the proceeds of it as he actually did. Whatever may have been his intention, the bank, his principal, cannot be held to have had constructive notice of the existence of the security, nor be held for its misappropriation.

5. It is said that the trial court erred in finding that demand was made upon appellant for the payment of the Libby Townsite & Lumber Company and the Oullette & Therriault notes before this action was brought, for that there was no evidence tending to support such a finding. The plaintiff was examined as a witness, and, among other things, testified: "I am acquainted with Joseph A. Coram, the defendant in this case. I met him over in Butte, Mont., along in the month of May, 1897, and had a conversation with him at that time relating to these notes. As to paying them, or any part of them; he said that suit would have to be brought, so that he could collect from the stockholders of the Globe National Bank,—the other stockholders. I don't remember his exact language, but he said suit would have to be brought before he would pay them,—words to that effect." The defendant also testified, but failed to admit or deny the statement of plaintiff. This evidence was sufficient to warrant a finding that demand was waived, and that any demand short of suit would be of no avail. The purpose of demand in such cases is to enable the party upon whom, under the terms of the contract, it must be made, to discharge his liability without a suit. When he unqualifiedly refuses to perform his obligation, a demand is useless, and therefore unnecessary. The law does not require a useless thing. (9 Am. & Eng. Enc. Law (2d Ed.), 209 ; *Bennett Bros. Co.* v. *Fitchett,* 24 Mont. 457, 62 Pac. 780.) While the trial

court should have found, according to the facts, that demand was waived, the defendant has no just cause to complain of the finding as made. .

6.	The next contention made by appellant is that the district court erred in finding in favor of plaintiff upon the issues made upon the payment of the Weitman note, which is the basis of the third cause of action.

On March 8, 1895, the original Weitman note was renewed; the new note being made payable to "Benton D. Hatcher" 12 months after date, and negotiable and payable at the Northwestern National Bank. It was thereupon indorsed in blank by Hatcher, and thereafter carried upon the account of bills receivable by the bank. The original note was secured by real and chattel mortgages. Upon the renewal of it on March 8, 1895, a new mortgage upon three lots in Kalispell was executed to Hatcher by Weitman and wife. The records of the bank did not at any time disclose the existence of this mortgage, nor, apart from the note itself, that it was payable to Hatcher. During all of this time, and, in fact, up to the time the bank closed its doors, Hatcher had general control of the affairs of the bank, and the books were kept under his direction. So the matter stood until January 7, 1896, when Hatcher agreed with Weitman that, if the mortgaged property should be conveyed to himself by Weitman and wife, he would accept it as payment of the note. The conveyance was made to "B. D. Hatcher, agent," and the note was accordingly canceled and delivered to Weitman. On August 13, 1896, Hatcher executed to the bank his note for the full amount of the Weitman note, signing it "B. D. Hatcher, Agent." This note does not on its face show upon whose behalf it was executed. The books of the bank show that it was credited against the Weitman note and interest as payment thereof, and from its date it was treated, and still is treated, as an asset of the bank. The uncontradicted statement of Hatcher is to the effect that at the time of the transaction with Weitman he told the plaintiff, who was vice president of the bank, that he was going to take the property from Weit-

man in payment of the note as the best thing to do. The vice president knew of the "Hatcher, Agent," note from the time of its appearance among the assets of the bank in August, 1896, though he testified that he had no personal knowledge of the mortgages securing the Weitman note at the time it was assigned to his bank. There is no word of testimony that Hatcher's course in the matter was objected to, and it affirmatively appears that it was never at any time repudiated by the bank authorities.

During his connection with the Northwestern National Bank, Hatcher appears to have acted as agent in several capacities, and made use of several different signatures. When acting for the bank, he used the signature, "B. D. Hatcher, Cashier." When acting for the stockholders of the Globe National Bank, he signed, "B. D. Hatcher, Agent." When acting in other capacities he signed, "B. D. Hatcher," or "Benton D. Hatcher." During his negotiations looking to a settlement of the Weitman note, considerable correspondence was had between him and Weitman and Wininger, his agent at Kalispell, and in each instance, save two, he signed his letters, "B. D. Hatcher, Cashier." In one of these instances he signed, "Hatcher," and in the other, "B. D. Hatcher." For his services in this and other matters connected with the business of liquidation, Wininger was paid by Hatcher out of the assets of the Globe National Bank, though Wininger understood that in the transaction he was acting for Hatcher as cashier. After the execution of the written guaranty by Coram, he was absent from Montana, residing at Lowell, Mass. Further than that Hatcher had charge generally of the settlement of the affairs of the Globe National Bank, he was never expressly authorized to act for Coram in any capacity whatever. When the Northwestern National Bank closed its doors, Hatcher being under arrest, Coram hastened to Montana, took over all the assets of the Globe National Bank, and paid Wininger a balance due him for services to Hatcher in connection with his previous employment, but took no conveyance of the Weitman lots. Thereafter he acted for the

stockholders. On February 6, 1897, Hatcher wrote Wininger, stating that the Weitman property, standing in his name as agent, should be deeded to the Northwestern National Bank. After the national bank examiner took charge on February 7, Hatcher offered to deed the property to the bank; but his offer was not accepted. At no time did the bank, or the receiver afterwards, return to Hatcher his note of August 13, 1896. Except the knowledge they may be presumed to have obtained from the condition of the books and the information possessed by the vice president, the other officers and the board of directors of the Northwestern National Bank were not informed of the Weitman transaction. Hatcher stated that, at the time he acted, he did the best he could for all parties, without reference to which of his principals would be responsible. No demand was ever made upon Weitman for the payment of his note after its surrender to him. Some time before the trial of this cause one of the directors of the Northwestern National Bank borrowed it from him, assuring him that no use would be made of it against him. This director handed it to the receiver, and it was introduced in evidence at the trial.

The trial court found upon these facts that, in taking the deed from Weitman and canceling his note, Hatcher acted without the scope of his authority as cashier, and that he acted for and on behalf of Coram and the other stockholders of the Globe National Bank. Hence the conclusion that the transaction did not amount to a payment of the note, so as to discharge Coram from his guaranty. Do the facts properly warrant this inference? It must not be overlooked that the defendant sustained two distinct relations to the affairs of the Globe National Bank. He was one of its record stockholders. As such he was interested in the settlement of its affairs. He, with others who sustained a like relation to it, was bound by the contract of guaranty individually to pay the debts in controversy upon the happening of the contingencies stated therein. His liabilities growing out of the former relation were imposed by law by virtue of his connection with the bank, and existed in favor

of the creditors of the bank only.   Under his contract his obligation was to the Northwestern National Bank, and was personal and voluntary.   Hatcher, having charge of the affairs of the Globe National Bank, was the agent of the corporation, and also Coram's agent, for all purposes connected with the trust between him and the creditors of the bank, with all authority necessarily implied by that employment.   No authority thus conferred upon him, however, enabled him to act as the agent of the defendant in any of his relations as debtor of the Northwestern National Bank.   If he had such authority, it must have been specially given, or must be implied from his and Hatcher's joint and several liability on the contract, or from their conduct with reference to the matters growing out of the contract. There is nothing in the facts stated tending to show that he had such express authority.   Nor does the fact that he and Hatcher were jointly and severally liable with the other stockholders on the contract of guaranty imply an authority in Hatcher to act as agent for him, so as to hold him for anything done affecting his personal liability under the contract.   Hatcher, by virtue of his relation, could not in any way change the conditions of the contract, or enlarge Coram's liability thereunder, without his consent,   Nor does the evidence tend to show that Coram, by any thing he did, impliedly authorized Hatcher to do otherwise in the premises than any other of the joint and several guarantors could have done.

So it appears that Hatcher did not, in his dealings with the Weitman note and the mortgage security, represent Coram in any capacity whatever.   It is apparent, also, that no authority, obtained directly or impliedly from the stockholders, empowered him to direct the mode by which payment of the note could or should be made.   The control of the note had passed from them by the assignment to the Northwestern National Bank, and they had no authority to interfere with it.   His action in the premises was either a gratuitous intermeddling on his individual account, or must be deemed to have been authorized by the bank.   But for the fact that he occupied the position of

cashier, he would have had no access to the securities belonging to the bank, and could have done nothing. When we come to examine his relations to the bank, we find that he practically controlled its affairs. It is somewhat significant that, upon a renewal of the particular note in March, 1895, he had it made payable to himself and then indorsed it to the bank. He at that time undoubtedly acted for the bank. Mr. Stanford, the vice president, stated that it was customary, when the bank took real estate security for loans, to have the notes and mortgages payable to some officer of the bank, and thus to evade the instructions of the comptroller of the currency prohibiting loans upon real estate security. This last statement makes clear the significance of Hatcher's behavior at that time, and in the light of the other facts surrounding the transactions connected with the subsequent dealings of Hatcher,—the length of time covered by them, his apparent exclusive control of the business, the condition of the books, etc.,—the only legitimate inference to be drawn from them is that the bank authorities must have known of them, and, at least tacitly, approved them. In any event, they must be presumed to have known of them, and be held to the legitimate consequences of such knowledge. It makes no difference, therefore, whether Hatcher acted by consent of the bank authorities in the first instance, or without such consent and beyond the scope of his authority as cashier. His action in the premises must be held to have been that of the bank. The Weitman note must, therefore, so far as Weitman is concerned, be held to have been paid off and discharged. It necessarily follows, also, that Coram's liability under his contract was discharged. (14 Am. & Eng. Enc. Law (2d Ed.), 1162.) There is no force, then, in the argument of the plaintiff that the debt of Weitman has not actually been paid in money. True, as the plaintiff contends, Hatcher was not, by virtue of the fact that he was cashier, authorized to take land in payment of a debt due the bank; but he in fact did so under circumstances which implied the consent and approval of the directors of the corporation, thus

constituting himself a trustee of the legal title thereto for its benefit. Under all 'the circumstances, it' is of no moment that he had the conveyance made to him as "agent," instead of "cashier."

Upon the facts stated, we think the defendant not liable upon the third cause of action for another reason. Conceding that the note has not been paid as was contemplated by the contract, the original note has been canceled and delivered up as paid. Weitman cannot now be held liable thereon. The debt guarantied by Coram has been substituted by another and a different one, due from a different person, namely, Hatcher. If Coram should be held to pay, his only recourse would be against Hatcher,—a contingency not contemplated by his undertaking. The bank, in dealing with the original debtor through Hatcher, has permitted a material change in the situation of the debt guarantied, by substituting another as the principal debtor. It has also put the security, which otherwise might have been available to the guarantor, beyond his reach. Under the principles of law applicable, Coram is entitled to claim his release. (Civil Code, Sec. 3650.)

We find no error in the action of the district court upon the first and second causes of action. As to these the judgment and order are affirmed. The defendant is entitled to a new trial upon the third cause of action. As to this, therefore, the judgment and order are reversed, and the cause is remanded, with directions to grant a new trial. Defendant may recover his costs.

MR. JUSTICE MILBURN, not having participated in the consultations had upon this cause, takes no part in this decision.